1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CURTIS HALL,

11              Petitioner,                    No. CIV S-03-2335 RRB DAD P

12        vs.

13   DAVID L. RUNNELS, Warden,

14              Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2001 judgment of

18   conviction entered against him in the Solano County Superior Court on charges of first degree

19   murder; first degree burglary; false imprisonment by violence, menace, fraud or deceit; sexual

20   battery; and battery.  He seeks relief on the grounds that: (1) his right to a fair trial was violated

21   by the improper admission of evidence; (2) his right to due process and a fair trial were violated

22   by the trial court's refusal to admit expert testimony relating to involuntary manslaughter and

23   give jury instructions on that lesser included offense; (3) there was insufficient evidence to

24   support his burglary conviction; and (4) the trial court violated his right to due process, a fair

25   trial, and the effective assistance of counsel when it failed to hold a hearing on his motion for

26   /////

1

substitution of counsel.  Upon careful consideration of the record and the applicable law, the

undersigned will recommend that petitioner's application for habeas corpus relief be denied.

FACTUAL BACKGROUND[1]

**Saturday, June 10, 2000**

Fairfield Police Officer Robert Matias was instructed to contact appellant's estranged wife, Desiree Hall.  Over the telephone Hall described to him the following incident that had occurred earlier that day:  She asked appellant to drive her and their daughter to the daughter's babysitter.  After leaving the daughter with the babysitter, appellant drove Hall to an unoccupied new housing construction site on the outskirts of town and stopped the car.  When Hall asked him to take her home, appellant refused, so she got out of the car and began walking away.  Appellant got out of the car, grabbed her from behind, and pulled her toward the car, fondling her breasts and buttocks.  She demanded that he stop.  He eventually did so, remarking,  "Do you know what I can do to you?  Do you know what I can do to you out here?  This ain't nowhere near over.  You don't know what I might do.  I could be suicidal right now.  I could drive off a bridge or something."  Appellant then drove Hall to her apartment and followed her inside.  She telephoned her mother and told her to telephone the police because appellant was in the apartment.  While Hall was on the telephone, appellant departed.

After taking the above report from Hall, Officer Matias, at her request, obtained a restraining order and served it on appellant.  Matias testified that appellant was cooperative with him when served the order, did not deny the incident at the construction site, and offered this explanation of the incident:  He and Hall were having marital problems and he took her to the site to try to mend them by talking to her.  When she refused to speak to him, he asked her, "'Is this what you want, for me to be an asshole and kidnap you and bring you out to an isolated area where you can't scream or nothing?'"

Appellant's trial testimony regarding the incident did not differ significantly from Officer Matias's testimony.  Appellant added that he had suspected Hall was seeing a man named "Rock," and he had not believed her explanation that Rock was only her marijuana supplier.  When he took Hall to the construction site, he asked her about Rock and she said nothing.  He touched her breasts and buttocks to get a response.

---

[1]  The following summary is drawn from the June 18, 2002, opinion by the California Court of Appeal for the First Appellate District (hereinafter Opinion), at pgs. 1-5, filed in this court on May 12, 2004, as Exhibit L to respondent's answer.

**Thursday-Friday, June 15-16, 2000**

Appellant worked his usual night shift at a pizzeria.  Toward the end of his shift he drank a pint of tequila, and after work he socialized with friends at a nightclub.  At approximately 12:30 a.m. he had an urge to see Hall.  He drove to her apartment complex, parked in one of its lots and, keeping in the shadows, moved toward her apartment.  He encountered two neighbor boys standing near her apartment and told them not to say his name aloud because he had a restraining order and Hall would call the police if she knew he was there.  He heard a car pull into a parking lot, saw the downstairs light of Hall's apartment come on, then saw Rock's car in the lot.  He saw the downstairs light go off and a light in the bedroom go on.  He became angry because Hall had lied to him about Rock.  Through Hall's open bedroom window appellant and the neighbor boys could hear sounds of sexual activity.  The neighbor boys declined appellant's request to knock on Hall's door to "interrupt what was going on."  Appellant walked away from the apartment and began to cry.  At approximately 2:00 a.m. he heard Rock's car leave the parking lot.

Angry and hurt, appellant returned to the nightclub.  He told a friend he had "'to talk to somebody before I kill someone.'"  The friend refused appellant's request to telephone Hall and ask her to pick up appellant at the club.

Appellant then drove to a marina where he tried to sleep in his car.  He could not, so he telephoned Hall from a pay phone and asked to speak to her in person.  She refused, admitted engaging in sexual relations with Rock, and informed appellant that he had "killed" any love she had for him during the encounter at the construction site.

Appellant's conversation with Hall made him suicidal and he wanted Hall to see him die; he wanted to "slit his throat" in front of her.  He returned to her apartment and crawled through the bathroom window at approximately 3:00 a.m.  He picked up a knife from the kitchen to kill himself, and as he was going upstairs to Hall's bedroom, he heard her telephone ring.  She picked it up, said nothing more than "hello," and hung up.  Appellant became even angrier thinking Rock was the caller.

Appellant opened Hall's bedroom door and turned on the light.  She was in bed and said, "Curtis, Curtis" and "just please go."  He put the knife to his throat, saying, "I want you to see what you've made me do."  Hall began to scream and move toward the door.  Appellant dropped the knife, caught her before she got off the bed, put his hand over mouth, and told her to be quiet because he did

/////

/////

3

not want the children to enter the room and see the suicide.[2]  He straddled her, put the knife between his stomach and ribcage, and told her, "I'm gonna do this and you are gonna watch me."  She was struggling and resumed screaming, so, to subdue her, he put his arm around her neck in a "choke-hold," i.e., caught her neck in the crook of his arm so she was unable to scream.  They fell to the floor, and she appeared to lose consciousness while in the chokehold.  He heard a faint heartbeat but she was not breathing. He thought of attempting to revive her, but the thought turned to anger and rage when he recalled her recent sexual activity with Rock.  He straddled her again, and saying "You did this," pushed down on her throat with enough force to choke her.  He was aware that in so doing he was killing "the woman I love."

After appellant stopped choking Hall, he attempted sexual intercourse with her.  Unable, he punched and kicked her.  He took her cell phone, erased the caller ID number from the pay phone from which he had called her, put the cell phone in her hand, and used her fingers to dial Rock's number.  He still wanted to commit suicide, but not when the children were in the apartment, so he departed.  He cleaned up and went to work at his day job.  When contacted by the police, he gave a complete and candid statement of the incident.

Officer Kevin Page was sent to Hall's apartment at 6:40 a.m.  He found her lying on the bedroom floor with blood on her forehead. He administered CPR even though she was without a pulse.

**Forensic Report**

Pathologist Bryan Peterson found some abrasions and a small incision on Hall's face, consistent with being punched in the face. He determined the cause of death as strangulation.  Given the extensive internal bleeding in the area of Hall's neck, he opined the amount of force used to strangle her was extreme and prolonged. He found no defensive wounds on her.

**Psychiatric Evidence**

Dr. James Missett, a forensic psychiatrist, testified as a defense witness.  He diagnosed appellant as having a longstanding and ongoing major depressive disorder, alcohol dependence to deaden

---

[2]  Hall's daughter with appellant and her other three children lived in the apartment.

Appellant's statement to the police differed slightly from his trial testimony.  He told the police that Hall moved toward the telephone next to the bed as she started to scream, and he moved toward her to prevent her from using the phone and put his hands over her mouth to stop her from screaming.  At trial he testified that he moved the telephone when he turned on the light, before she started to scream.

the depression, and dependent characteristics.  He calculated that appellant's blood alcohol content was below .1 when he killed Hall, enough to impair his judgment.  He opined that appellant consumed alcohol as a mechanism to cope with his depression.

PROCEDURAL BACKGROUND

On October 4, 2000, an information was filed in the Solano County Superior Court charging petitioner with the murder of Desiree Hall with use of a knife (count I); first degree residential burglary (count II); false imprisonment by violence (count III); sexual battery by restraint (count IV); and battery (count V).  (Clerk's Transcript on Appeal (CT) at 20-22.) After a jury trial, petitioner was convicted on all substantive counts against him.  (Id. at 165.) The jury found the weapon enhancement as to count I to be untrue.  (Id.)  On April 3, 2001, petitioner was sentenced to a total prison term of 28 years and eight months to life.  (Id. at 196.) (Points and Authorities attached to Petition (P&A) at 2.)

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v.Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

1
2
3

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

4
5

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

6
7

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8   28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

9   Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

10          The court looks to the last reasoned state court decision as the basis for the state

11   court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

12   court reaches a decision on the merits but provides no reasoning to support its conclusion, a

13   federal habeas court independently reviews the record to determine whether habeas corpus relief

14   is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

15   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

16   reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

17   AEDPA's deferential standard does not apply and a federal habeas court must review the claim

18   de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

19   1167 (9th Cir. 2002).

20   II.  Petitioner's Claims

21          A.  Evidence of Prior Thefts

22          Petitioner raises several claims relating to the admission into evidence at his trial

23   of testimony and documentation that petitioner committed a theft at his former place of business.

24   Petitioner argues that the admission of this evidence violated his right to a fair trial.  The

25   California Court of Appeal fairly explained the background to these claims as follows:

26   /////

Before trial defense counsel made an informal request for discovery under the reciprocal discovery statute. (§1054 et seq.) At the outset of trial, the court ruled there was to be no introduction of evidence of appellant's uncharged bad acts absent its further order.

Appellant's father, Curtis Hall, Sr., was called as a character witness for the defense. Asked his opinion about appellant's character for truth and honesty, he testified, "I feel that he tell [sic] the truth."

On cross-examination, Mr. Hall denied any familiarity with the facts surrounding appellant's departure from employment the previous year at a Best Buy store. The following colloquy then occurred:

"PROSECUTOR:  Now, would it affect your opinion as to your son's character for truthfulness and honesty to be acquainted with the fact that he was in fact –

"DEFENSE COUNSEL:  Objection, your Honor.  [¶]  Assumes facts not in evidence.

"COURT:  Objection is overruled.

"PROSECUTOR:  – that your son was in fact fired from that store for admitted theft?"

The court overruled defense counsel's objection that the question assumed facts not in evidence because the question was appropriate for character evidence. Mr. Hall then answered that knowing this fact about appellant would affect his opinion.

Testifying immediately after his father, appellant testified that he was told who was involved with a theft at Best Buy the previous year, but denied having anything to do with that or any other theft at Best Buy.

On cross-examination, the following colloquy occurred:

"PROSECUTOR:  Isn't it true that in fact you, along with your friend, Mr. Lonnie Thompson, AKA DJ Smurf were involved in a series of thefts from Best Buy?

"APPELLANT:  We had one incident, but it was never proven.

"PROSECUTOR:  Let me back up here now.  You are not – so your testimony was 'I didn't do it.'  That's what you answered to defense counsel.  Now your answer to me was it was never proven?

"APPELLANT:  Correct.

7

"PROSECUTOR:  Let me show you – isn't this your written statement that you gave in connection with that case in which you openly admit the theft of almost $48,000 worth of merchandise from that store?

"APPELLANT:  I said – yes, I knew people that was involved, yes.

"PROSECUTOR:  You knew some people who were involved. Wasn't one of those persons yourself?"

Before appellant answered, defense counsel asked to see the document being shown to him.  She read it and asked to make a motion.  After an off-the-record discussion at the bench, the court directed the prosecutor to go on to another subject.

Although not entirely clear from the record, the document presented to appellant was apparently his statement to the police contained in a report of the Fairfield Police Department concerning the Best Buy thefts.  At a subsequent hearing outside the jury's presence, defense counsel objected to the prosecutor's use of the report because it was not provided pursuant to her informal discovery request, and had she known it would be used, she would not have called appellant's father as a character witness.

The prosecutor replied that appellant's statement in the report was used for impeachment, and the statement with which he was confronting appellant was appellant's own written statement.  The court responded that whether or not there was a discovery violation, the prosecutor's reference to the Best Buy incident was a violation of its earlier in limine order forbidding evidence about prior bad acts until further court order.  Its tentative ruling "on this whole matter" was to preclude the prosecutor from asking any further questions about the Best Buy incident, and telling the jurors to disregard those questions and answers.  The trial was then recessed for lunch.

After the lunch recess defense counsel moved to have the evidence about Best Buy excluded.  The court replied that, based on its noontime research, there was no violation of the discovery statute. Characterizing the prosecutor's violation of the in limine order as unintentional, it then asked counsel to address the appropriate action for the violation.  Defense counsel stated:  "[M]y only reaction to that is I'm very confident that the Court has discretion to exclude as a sanction."  The prosecutor apologized for violating the in limine order and stated that he did not intend "doing anymore with it."  The court replied, "[T]hat sort of solves the problem.  I don't intend to say anything more to the jury about it."

There was one more reference to the Best Buy incident during Dr. Missett's later direct examination as a defense witness.  He testified that in examining appellant he looked for but did not find

8

indicia of antisocial conduct, even though appellant had killed his wife and "had told me about his involvement with things at Best Buy where there was a friend who was taking things out of the store."

The court instructed that statements made by attorneys during trial are not evidence, that the jury should not assume to be true any insinuation suggested by a question asked a witness, and that a question is not evidence and may be considered only as it helps to understand the answer.

(Opinion at 5-7.)

Petitioner claims that his right to a fair trial was violated by the trial court's failure to "remedy the improper cross-examination" of his father.  (P&A at 19.)  Petitioner suggests that the trial court should have sustained defense counsel's objection to the improper cross-examination questions and admonished the jury to disregard reference to the thefts at Best Buy, or declared a mistrial as a sanction for the prosecutor's violation of the court's in limine order. (Id. at 19.)  Petitioner also claims that the prosecutor violated his right to due process and a fair trial when she failed to disclose to the defense prior to trial that petitioner had given a statement to police regarding the thefts at Best Buy and that she intended to use this statement at trial.  (Id. at 16.)  He argues that the prosecutor's questions left the impression in the jurors' minds that he had committed a "major theft" and that this "bombshell" undermined his defense strategy that he could be trusted to tell the truth about his role in the murder.  (Id. at 21.)

The California Court of Appeal rejected petitioner's arguments that the evidence about the thefts at Best Buy was improperly admitted.  The appellate court concluded, first, that the prosecution was entitled to impeach Mr. Hall's testimony that petitioner was a truthful person with evidence that petitioner was terminated from his employment at Best Buy because of his involvement in thefts from the store.  (Opinion at 8.)  The court reasoned that, pursuant to California law, the prosecution may properly cross-examine a character witness regarding acts or conduct that are inconsistent with the witness's testimony, even if those acts are merely "arrests, rumors, or reports."  (Id.)

9

1          The state appellate court next concluded that the trial court did not err in failing to

2    declare a mistrial or exclude evidence of the Best Buy thefts as a sanction for the prosecutor's

3    asserted discovery violation.  (Id.)  The court assumed for the sake of argument that the

4    prosecutor had a statutory obligation to disclose to the defense prior to trial petitioner's statement

5    to police regarding the thefts, but concluded that the sanctions provided for by statute were no

6    longer available on appeal.  (Id. at 8-9.)  The court explained that in order to prevail on his claims

7    in the posture of a direct appeal, petitioner was required to show that "the information not

8    disclosed was exculpatory and that there is a reasonable probability of a different result had the

9    evidence been disclosed."  (Id. at 9.)  The court concluded that petitioner was not able to meet

10   this test because "the undisclosed information – his statement to the police in which he

11   purportedly implicated himself in the Best Buy thefts – is patently not exculpatory."  (Id.)

12          Petitioner's claim that the admission of evidence regarding the Best Buy thefts

13   violated California discovery rules and/or the California Evidence Code are not cognizable in this

14   federal habeas corpus proceeding.  Under clearly established federal law, such claims do not

15   provide a basis for federal habeas relief.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)

16   ("We have stated many times that federal habeas corpus relief does not lie for errors of state

17   law.") (citations and internal quotation marks omitted); Winzer v. Hall, 494 F.3d 1192, 1198 (9th

18   Cir. 2007) ("State court rulings on the admissibility of evidence generally fall outside the scope

19   of federal habeas relief, which is designed only to remedy violations of federal law."); Little v.

20   Crawford, 449 F.3d 1075, 1082 (9th Cir. 2006) (same).  The conclusion of the state courts that

21   the prosecutor did not violate state rules governing pretrial discovery is final and unreviewable in

22   federal habeas proceedings.  Estelle, 502 U.S. at 67-68.

23          To the extent that petitioner has presented a federal constitutional claim by virtue

24   of his arguments set forth above, the issue presented may fairly be described as whether the

25   admission of evidence regarding the Best Buy thefts violated petitioner's right to a fair trial

26   because it damaged his credibility to the point that it prejudiced his defense.  This court

1  concludes that it did not.  Petitioner did not admit to any culpability in connection with the thefts

2  and there was no evidence presented that he was guilty of any wrongdoing.  In fact, petitioner

3  specifically denied personal involvement in the thefts.  In addition, issues regarding the thefts

4  were collateral to the murder charge against petitioner.  With respect to the murder, petitioner

5  testified that at the time he entered the victim's apartment he had no intent to assault her, but that

6  he strangled her in the heat of passion.  This testimony concerned petitioner's mental state at a

7  particular moment in time, influenced by events that had recently occurred involving petitioner

8  and his wife.  Evidence that one of petitioner's friends may have committed a theft in the past at

9  petitioner's former place of employment, even if the theft was with petitioner's knowledge,

10  would have had no bearing whatsoever on an assessment of petitioner's testimony at trial.  In

11  short, admission of evidence regarding the thefts did not prevent petitioner from presenting his

12  defense to the murder.

13         This court notes that habeas corpus relief may be granted only in those cases

14  where errors occurring at trial resulted in "actual prejudice."  Brecht v. Abrahamson, 507 U.S.

15  619, 636-38 (1993).  On collateral review, an error is not "harmless" if it "had substantial and

16  injurious effect or influence in determining the jury's verdict."  Id. at 637.  See also Fry v. Pliler,

17  ___ U.S. ___, 127 S. Ct. 2321, 2328 (2007) (In § 2254 proceedings a federal court "must assess

18  the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial

19  and injurious effect' standard set forth in Brecht, [citation omitted], whether or not the state

20  appellate court recognized the error and reviewed it for harmlessness . . . .").  In this case, the

21  theoretical possibility that evidence of the Best Buy thefts prejudiced the jurors' view of

22  petitioner's overall credibility does not constitute "actual prejudice."  Brecht, 507 U.S. at 636.

23  As noted above, the evidence used to impeach petitioner's father was on a matter completely

24  unrelated to the charges against petitioner.  Further, petitioner was well aware of the

25  circumstances surrounding the alleged thefts at Best Buy and could have taken that information

26  into account in determining how to present his defense.  In light of this, petitioner cannot show

that the result of the proceeding would have been different had the prosecutor disclosed pretrial the information about the thefts.

Nor has petitioner demonstrated that the prosecutor's handling of discovery constituted prosecutorial misconduct.  A criminal defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181 (1986); Sassounian v. Roe, 230 F.3d 1097, 1106 (9th Cir. 2000).  Relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice.  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (citing Brecht, 507 U.S. at 637-38).  For the reasons set forth above, the actions of the prosecutor here did not cause substantial prejudice to petitioner or render his trial unfair.  See Gansz v. Jones, 418 F. Supp. 2d 923, 929 (E.D. Mich. 2006) (State court's determination that petitioner was not denied fair trial as result of trial court's decision to permit prosecutor to use petitioner's police statement for impeachment, despite fact that prosecutor had not complied with a discovery order requiring it to produce impeachment evidence, was not contrary to, and did not represent unreasonable application of clearly established federal law, and thus did not warrant federal habeas relief, where petitioner presumably knew of statements and could have shared that information with defense counsel, and there was no evidence petitioner was prejudiced by the late disclosure.)

Finally, in Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  The evidence at issue here does not come within the rule of Brady because it was not exculpatory.

Accordingly, for all of these reasons, petitioner is not entitled to relief on his claim that his right to a fair trial was violated by the prosecutor's reference to the thefts at Best Buy in cross-examining petitioner's father who had been called by the defense as a character witness.

B.  <u>Expert Testimony and Jury Instructions Regarding Involuntary Manslaughter</u>

Petitioner claims that his right to due process and a fair trial were violated when the trial court refused to admit into evidence his proffered expert testimony on chokeholds and to give a related jury instruction on the lesser included offense of involuntary manslaughter.  The California Court of Appeal fairly described the background to these claims as follows:

> Just before Dr. Missett was to be called as a psychiatric expert witness, defense counsel informed the court that Dr. Missett had previously qualified as an expert respecting the lethal effect of a chokehold and "how the police departments have stopped doing it."  She asked that he also be allowed to testify as an expert on the fatal effect of chokeholds.  Defense counsel explained that Dr. Missett's testimony was relevant to appellant having "no way of knowing that that chokehold that he applied to quiet [Hall] would have been lethal."  The court denied the request on the ground it was "not subject to expert opinion."

(Opinion at 9.)

1.  <u>Expert Testimony</u>

Petitioner claims that the rejected proffered testimony of Dr. Missett would have provided critical support for his defense that he killed the victim unintentionally in the process of attempting to keep her quiet by applying a chokehold.  Petitioner states, "the obvious point of the proposed testimony was that the physiological effects of choking or throttling were such that an individual with a near [sic] intent to subdue or quiet another person could unintentionally kill them by an unwittingly forceful or extended choking."  (P&A at 22.)  Petitioner also argues that the proposed testimony by Dr. Missett would have "neutralized" testimony by a prosecution witness that the amount and duration of force applied to the victim demonstrated "an intent to kill as well as premeditation and deliberation."  (Id. at 23.)  Petitioner attacks the trial court's ruling that the rejected evidence was not within the purview of expert testimony, arguing that "average citizens and jurors do not have experience in their own lives with strangling individuals with varying degrees of force to familiarize themselves with the line between non-lethal and lethal force."  (Id. at 24.)  Petitioner contends that the trial court erred in rejecting Dr. Missett's

13

1  proffered testimony, thereby "leaving the prosecutor's theory of premeditation and deliberation

2  unrebutted."  (Id.)

3        The California Court of Appeal rejected petitioner's arguments in this regard.  The

4  appellate court concluded that the trial court did not abuse its discretion in excluding the

5  proposed testimony because the matters to which the expert would have testified were

6  sufficiently within common experience that expert testimony was not necessary.  (Opinion at 10.)

7  The court explained its reasoning as follows:

8        Expert testimony was unnecessary to explain appellant's defense
         that he lacked the intent to kill because he was simply trying to
9        silence Hall when he caught her in a chokehold.  The jury was able
         to evaluate this theory on the basis of both its common experience
10       on efficacious methods of preventing people from screaming and
         the other trial testimony.  The pathologist testified that Hall's
11       injuries were consistent with strangulation by extreme and
         prolonged force.  Appellant himself testified that when he released
12       Hall from the chokehold she still had a heartbeat but rather than
         attempt to revive her, he forcibly choked her again, knowing he
13       was killing her, and punched and kicked her.  We find no abuse in
         the court's refusal to admit the proposed expert testimony of Dr.
14       Missett concerning chokeholds.

15 (Id.)

16       Criminal defendants have a constitutional right, implicit in the Sixth Amendment,

17 to present a defense; this right is "a fundamental element of due process of law."  Washington v.

18 Texas, 388 U.S. 14, 19 (1967).  See also Crane v. Kentucky, 476 U.S. 683, 687, 690 (1986);

19 California v. Trombetta, 467 U.S. 479, 485 (1984); Webb v. Texas, 409 U.S. 95, 98 (1972).

20 However, the constitutional right to present a defense is not absolute.  Alcala v. Woodford, 334

21 F.3d 862, 877 (9th Cir. 2003).  "Even relevant and reliable evidence can be excluded when the

22 state interest is strong."  Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).  Thus,

23       [w]here evidence has been excluded pursuant to a state evidentiary
         law, we use a balancing test:  In weighing the importance of
24       evidence offered by a defendant against the state's interest in
         exclusion, the court should consider the probative value of the
25       evidence on the central issue; its reliability; whether it is capable of
         evaluation by the trier of fact; whether it is the sole evidence on the
26       issue or merely cumulative; and whether it constitutes a major part

1  of the attempted defense. A court must also consider the purpose of
   the [evidentiary] rule; its importance; how well the rule
2  implements its purpose; and how well the purpose applies to the
   case at hand. The court must give due weight to the substantial
3  state interest in preserving orderly trials, in judicial efficiency, and
   in excluding unreliable or prejudicial evidence.

4

5  <u>Alcala</u>, 334 F.3d at 877 (quoting <u>Miller v. Stagner</u>, 757 F.2d 988, 994 (9th Cir. 1985)).  The

6  exclusion of evidence pursuant to state law does not abridge a criminal defendant's right to

7  present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty

8  interest of the accused."  <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324-25 (2006) (quoting

9  <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998)).  <u>See</u> <u>also</u> <u>Crane</u>, 476 U.S. at 689-91

10 (discussion of the tension between the discretion of state courts to exclude evidence at trial and

11 the federal constitutional right to "present a complete defense"); <u>Greene v. Lambert</u>, 288 F.3d

12 1081, 1090 (9th Cir. 2002).

13        Under the circumstances of this case, petitioner's right to present a defense and to

14 a fair trial were not violated by the trial court's decision to exclude the proffered "expert"

15 testimony of Dr. Missett.  As noted by the state appellate court, petitioner admitted that after he

16 ceased applying the chokehold he hesitated briefly and then deliberately choked the victim,

17 knowing he was killing her.  (<u>See</u> Reporter's Transcript on Appeal (RT) at 442-48.)  Even

18 assuming that it is not common knowledge that the prolonged application of a chokehold can

19 inadvertently result in death, Dr. Missett's proposed testimony was largely irrelevant, given that

20 it was undisputed that petitioner deliberately choked the victim after he released the chokehold.

21 In light of these facts, the trial court's evidentiary ruling was not arbitrary or disproportionate and

22 did not infringe upon petitioner's right to present a complete defense.  Accordingly, petitioner is

23 not entitled to relief on this claim.

24        2. <u>Jury Instruction on Lesser Included Offense</u>

25        Petitioner also claims that his rights to "a jury fully instructed on lesser-included

26 offenses and on his theory of defense" were violated by the trial court's refusal to give a jury

1   instruction on the lesser included offense of involuntary manslaughter.  (P&A at 24.)  As

2   explained by the California Court of Appeal,

> The [trial] court refused appellant's request to instruct on
> involuntary manslaughter as a lesser included offense on the
> grounds there was no substantial evidence to support the
> instruction.  It instructed on deliberate and premeditated first
> degree murder, express and implied malice second degree murder,
> and heat of passion/sudden quarrel voluntary manslaughter as a
> lesser included offense of murder.

7   (Opinion at 10.)

8           The United States Supreme Court has held that the failure to instruct on a lesser

9   included offense in a capital case is constitutional error if there was evidence to support the

10  instruction.  See Beck v. Alabama, 447 U.S. 625, 638 (1980).  The Supreme Court has not

11  decided whether this rationale also extends to non-capital cases.  See Turner v. Marshall, 63 F.3d

12  807, 818 (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir.

13  1999).  The Ninth Circuit, like several other federal circuits, has declined to extend Beck to find

14  constitutional error arising from the failure to instruct on a lesser included offense in a

15  non-capital case.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000); Bashor v. Risley, 730

16  F.2d 1228, 1240 (9th Cir. 1984).  See also Valles v. Lynaugh, 835 F.2d 126, 127 (5th Cir. 1988);

17  Trujillo v. Sullivan, 815 F.2d 597, 602 (10th Cir. 1987); Perry v. Smith, 810 F.2d 1078, 1080

18  (11th Cir. 1987).

19           The trial court's refusal to give an instruction on the lesser included offense of

20  involuntary manslaughter did not rise to the level of a constitutional error for which federal

21  habeas relief is available because petitioner's was not a capital case.  See Windham v. Merkle,

22  163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser

23  included offenses in a non-capital case does not present a federal constitutional question.").  To

24  find a constitutional right to a lesser-included offense instruction in this non-capital case would

25  require the application of a new rule of law, which the court may not do in a habeas proceeding.

26  Teague v. Lane, 489 U.S. 28 (1989).  See Solis, 219 F.3d at 929 (habeas relief for failure to

1   instruct on lesser included offense in non-capital case barred by <u>Teague</u> because it would require

2   the application of a new constitutional rule); <u>Turner</u>, 63 F.3d at 819 (same).  Under these

3   circumstances, the decision of the California courts denying petitioner relief as to this claim was

4   not contrary to federal law as set forth in the decision in <u>Beck</u>.

5           Moreover, as explained by the California Court of Appeal:

6           Appellant's own testimony obviates an involuntary manslaughter
            instruction, even if Dr. Missett's expert testimony regarding
7           chokeholds had been admitted.  Appellant admitted that after he
            released Hall from the chokehold, and considered reviving her
8           because he heard a heartbeat, he instead put his hands around her
            neck again with enough force to choke her, and he was aware that
9           his act was killing her.  His own admission established at least an
            intent to kill, thereby eliminating an element of involuntary
10          manslaughter.

11          Even assuming error in failing to instruct on involuntary
            manslaughter, the error was harmless.  (citation omitted.)
12          Although instructed on voluntary manslaughter and second degree
            murder, the jury found appellant guilty of first degree murder on a
13          deliberate and premeditated theory.  It also found him guilty of
            burglary after being instructed that to prove him guilty as charged
14          therewith, it had to be proved that at the time he entered Hall's
            apartment, he had "the specific intent to commit the crime of
15          assault by means of force likely to produce great bodily injury."  In
            light of these findings, it is not reasonably probable the jury would
16          have acquitted him of murder and voluntary manslaughter and
            found him guilty only of involuntary manslaughter had it been
17          instructed thereon.

18   (Opinion at 11.)

19          The state appellate court's conclusion that the evidence presented at petitioner's

20   trial did not support a lesser included instruction on involuntary manslaughter and that the trial

21   court's refusal to give such an instruction was harmless is not contrary to or an unreasonable

22   application of federal law.  <u>See</u> <u>Brecht</u>, 507 U.S. at 637.  The jury in this case was properly given

23   all instructions supported by the evidence.  Accordingly, petitioner is not entitled to relief on this

24   claim.

25   /////

26   /////

C. <u>Insufficient Evidence</u>

Petitioner claims that the evidence introduced at his trial was insufficient to support his conviction on the charge of burglary. Petitioner argues that the victim's apartment was also his home, even though he had temporarily vacated it in an attempt to repair his marriage, and that, pursuant to California law, he could not be found guilty of "burglary on his own home." (P&A at 27.) Petitioner states that he had "in no way moved out of the house in any permanent sense, nor had he yielded any possessory right to Desiree or anyone else in a legal sense." (<u>Id.</u> at 27-28.) Petitioner concedes that he was subject to a restraining order at the time of the killing which precluded him from being within 100 yards of the residence. However, he argues that the victim's apartment "was no less his own home even though he was temporarily barred from its use." (<u>Id.</u> at 29.) Petitioner states, "the outstanding restraining order might have subjected him to a prosecution for a violation of Penal Code section 166, but did not alter his relationship as joint tenant as to the premises, thereby precluding a burglary conviction." (Traverse at 10.)

The California Court of Appeal rejected this argument, explaining its reasoning as follows:

> Appellant relies on <u>People v. Gauze</u> (1975) 15 Cal.3d 709 to support his argument. In <u>Gauze</u>, the defendant was convicted of burglary after he entered his own apartment with the intent to assault his roommate. <u>Gauze</u> concluded a person cannot be convicted of burglary if he has an unconditional right to enter his own home, even if entering for felonious purposes. The corollary is that one may be convicted of burglary even if entering a dwelling with consent, provided the person "does not have an unconditional possessory right to enter." (<u>People v. Pendleton</u> (1979) 25 Cal.3d 371, 382.)
>
> Substantial evidence supports the jury's implied finding that appellant lacked an unconditional possessory right to enter Hall's apartment. The second week of May 2000 appellant moved out of the apartment he shared with Hall, her three children and their daughter. On June 10, 2000, he was served with a restraining order that prohibited him from coming within 100 yards of Hall or the apartment. In the early morning hours of June 16 when he went into the apartment he knew there were 24 hours remaining on the

18

1
2
3
4

> restraining order, and that he could be arrested if he violated the order.  He entered the apartment through the bathroom window because he thought Hall would telephone the police if she heard him enter through the front door.  Given substantial evidence that appellant did not have an unconditional possessory right to enter the apartment, there is substantial evidence to support the burglary conviction.

5    (Opinion at 12.)

6            The Due Process Clause of the Fourteenth Amendment "protects the accused

7    against conviction except upon proof beyond a reasonable doubt of every fact necessary to

8    constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There

9    is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

10   favorable to the prosecution, any rational trier of fact could have found the essential elements of

11   the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  See also

12   Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  "[T]he dispositive question

13   under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond

14   a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson,

15   443 U.S. at 318).  A petitioner in a federal habeas corpus proceeding "faces a heavy burden when

16   challenging the sufficiency of the evidence used to obtain a state conviction on federal due

17   process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the

18   writ, the habeas court must find that the decision of the state court reflected an objectively

19   unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275.

20           The court must review the entire record when the sufficiency of the evidence is

21   challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

22   vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

23   the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

24   reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  If the trier of

25   fact could draw conflicting inferences from the evidence, the court in its review will assign the

26   inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  "The

1   relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

2   the jury could reasonably arrive at its verdict." United States v. Dinkane, 17 F.3d 1192, 1196

3   (9th Cir. 1994) (quoting United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)). See also

4   Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court determines the

5   sufficiency of the evidence in reference to the substantive elements of the criminal offense as

6   defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

7          As the California Court of Appeal explained, under state law petitioner could not

8   be found guilty of burglary if he had an unconditional possessory right to enter the apartment.

9   However, there was evidence introduced at trial that petitioner did not have an absolute right to

10  enter the apartment. First, petitioner was subject to a restraining order which precluded him from

11  even approaching the premises. Moreover, there is no evidence that the victim gave petitioner

12  permission to enter the apartment. On the contrary, he entered through a bathroom window

13  because he knew she would not voluntarily grant him such permission. Finally, when the victim

14  saw petitioner in her bedroom she told him to leave. This evidence was sufficient to allow a

15  rational juror to find that petitioner committed burglary when he entered the apartment without

16  permission in order to commit a crime against the victim. See People v. Smith, 142 Cal. App.

17  4th 923, 932 (2006) (where defendant's wife was awarded sole possession of the family home in

18  family court and was granted a TRO against defendant because of his acts of violence towards

19  her, defendant could be charged with burglary when he entered the home with the intent to

20  commit an assault because, although defendant had a possessory interest in the family home, he

21  did not possess the right to enter as an occupant when his wife was present); People v. Sears, 62

22  Cal. 2d 737 (1965) (defendant properly found guilty of burglary where he had moved out of the

23  family residence three weeks prior to the crime and could claim no right to enter the family

24  residence without permission), overruled on other grounds by People v. Cahill, 5 Cal. 4th 478,

25  510, n.17 (1993).

26  /////

1    Because there was substantial evidence presented at trial to support petitioner's

2  conviction on the burglary charge, he is not entitled to habeas relief on this claim.  See 28 U.S.C.

3  § 2254(d).

4    D.  Motion for Substitute Counsel

5    In his last claim, petitioner contends that the trial court violated his right to due

6  process, a fair trial and the effective assistance of counsel when it failed to hold a hearing and

7  rule on his Marsden motion for substitute counsel.[3]  The California Court of Appeal described

8  the background to petitioner's Marsden claim as follows:

9    The complaint against appellant was filed on June 20, 2000.  He
    was represented at the time by the county public defender's office.
10

11    On August 8, 2000, the public defender's office was relieved as
    counsel because of a conflict, and the court appointed the county
    conflict public defender's office to represent appellant.  On August
12    22, Diane Bylund of the conflict office was assigned to represent
    him.  Bylund appeared with appellant at the September 26
13    preliminary hearing and, after he was held to answer, the October
    17 arraignment.  Trial was set for February 21, 2001.
14

    On December 1, 2000, appellant prepared a form Marsden motion.
15    He attached to it a letter to Judge Kinnicutt, who had heard all
    matters in the case since June 26.
16

17    Appellant's letter states: (1) he had no "paperwork" regarding his
    case, so was "in the dark" as to its status; (2) Bylund was not in her
    office at the two times per day he was allowed to use the telephone;
18    (3) he asked but had not yet received a court order allowing him
    more frequent access to the telephone; (4) he asked Bylund for the
19    paperwork on his case and she told him it is "part of the procedure"
    not to give homicide defendants such papers because "someone
20    else might see [them] and turn state's evidence on me;" (5) he had
    not seen Bylund since the end of October; (6) he "was told" that he
21    should see his attorney at least weekly due to the seriousness of the
    charge; (7) he did not know "how true what my attorney has said
22    is," but he did not feel he would get a fair representation by Bylund
    as his attorney; (8) he did not object to postponing his trial if he
23    could have an attorney who would cooperate with him during trial.

24

25    [3]  In People v. Marsden, 2 Cal. 3d 118 (1970), the California Supreme Court held that a
26  trial court must permit a defendant seeking a substitution of counsel after the commencement of
    the prosecution's case to specify the reasons for his request.

    21

On December 21, Judge Kinnicutt forwarded appellant's motion and letter to Bylund "to take any action" she deemed appropriate. Judge Kinnicutt also forwarded to Bylund a "notice of document review" of appellant's <u>Marsden</u> motion, prepared for Judge Kinnicutt by a judicial assistant and signed by the judge on December 11. The "notice of document review' contains a notation by the judicial assistant reminding Judge Kinnicutt that Bylund had submitted an order for appellant's greater use of the telephone, and Judge Kinnicutt in turn had informed Bylund that she needed to contact the jail administration because he could not give such blanket authorization.

There is no further reference in the record to appellant's December 1, 2000 <u>Marsden</u> motion, nor any reference to a renewed motion. Judge Kinnicutt presided over the February 2001 trial.

(Opinion at 13-14.)[4]  This court also notes that the form <u>Marsden</u> motion filed by petitioner reflects numerous possible areas of conflict between a criminal defendant and his/her trial counsel; however, none of them appear to have been highlighted by petitioner.  (CT at 28-30.) Instead, petitioner appears to have used the letter attached to the motion to explain his concerns to the trial court.  (<u>Id.</u> at 27.)

Petitioner challenges the failure of the trial court to hold a hearing on his <u>Marsden</u> motion or to issue a ruling thereon.  He argues that the failure to hold a hearing "constitutes clear error on the part of the trial court" and "infring[ed] petitioner's rights to due process and the effective assistance of counsel."  (P&A at 31.)  Petitioner "urges this court to grant an evidentiary hearing to remedy the violation of petitioner's right to counsel."  (Traverse at 11.)

The California Court of Appeal concluded that petitioner's constitutional rights were not violated by the trial court's handling of his letter.  The state court found that petitioner fully expressed his complaints about his trial counsel in the letter attached to the form <u>Marsden</u> motion, that petitioner's major concerns were addressed by the trial judge's forwarding of the motion and letter to petitioner's trial counsel, and that the trial court "effectively" denied

---

[4] Petitioner notes that the file-stamp date on the <u>Marsden</u> motion is six days after the date petitioner's motion and letter were forwarded to his trial counsel by the court.  It appears that the trial court did not file the motion until after Judge Kinnicutt had received and forwarded it.  (CT at 25-30.)

1  petitioner's <u>Marsden</u> motion notwithstanding the lack of a formal ruling.  The appellate court

2  also concluded that petitioner's right to counsel was not violated by the trial court's actions

3  because there was no evidence that petitioner and his trial counsel "had become embroiled in

4  such an irreconcilable conflict that ineffective representation was likely to result."  (Opinion at

5  14.)  The appellate court explained its reasoning as follows:

> A full-blown hearing on such a <u>Marsden</u> motion is not required
> when the defendant sets forth the bases of his dissatisfaction with
> his attorney in a sufficiently detailed letter.  (<u>People v. Freeman</u>
> (1994) 8 Cal.4th 450, 481.)  Here, appellant's letter to Judge
> Kinnicutt particularly itemized his complaints about Bylund: too
> little contact and failure to provide documents, but his complaints
> did not constitute an adequate basis for substitution.  The letter
> does not articulate any reasons that reveal a fundamental conflict
> between him and Bylund regarding trial strategy or that suggest she
> would be unprepared for trial.  (<u>Id.</u> at p. 481.)  Nor does it
> demonstrate inadequate representation as of the date of the motion.
> As the record shows, Bylund was taking steps to obtain greater
> telephone access for him, and she had offered him a rational
> explanation of why providing him copies of documents in the jail
> was unwise.
>
> At most, appellant's letter enumerates the kinds of client
> complaints that are easily and readily rectified once the attorney is
> alerted to them.  Insofar as there is no further complaint about
> Bylund on the record after Judge Kinnicutt forwarded appellant's
> motion and letter to her, it is reasonable to infer that when she
> received them, she corrected to appellant's satisfaction the
> perceived failure to communicate.
>
> We find no error in the court's effective denial of appellant's
> motion for new counsel without holding a hearing.

20  (<u>Id.</u> at 14-15.)

21       The Sixth Amendment to the United States Constitution guarantees the right to

22  the assistance of counsel in a criminal prosecution.  Such assistance must be effective and

23  competent.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984).  Where a defendant is

24  proceeding with the assistance of counsel, he may move to dismiss or substitute his appointed or

25  retained attorney.  The grant or denial of such a motion may depend on its timeliness and the

26  nature of the conflict between the defendant and current counsel.  <u>Hudson v. Rushen</u>, 686 F.2d

826, 829 (9th Cir. 1982); see also United States v. McClendon, 782 F.2d 785, 789 (9th Cir.

1986).  Refusal to allow substitution of attorneys may result in denial of the constitutional right

to effective assistance of counsel if the defendant and his attorney are embroiled in an

"irreconcilable conflict."  Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970).  The Sixth

Amendment guarantee of the right to counsel and to effective assistance of counsel, however,

does not include a right to "a 'meaningful relationship' between an accused and his counsel."

Morris v. Slappy, 461 U.S. 1, 13-14 (1983).  Thus, "not every conflict or disagreement between

the defendant and counsel implicates Sixth Amendment rights."  Schell v. Witek, 218 F.3d 1017,

1027 (9th Cir. 2000) (en banc).

           In reviewing a trial court's decision to deny a motion to substitute counsel in the

context of a § 2254 proceeding such as this, the focus is different than that on appeal.  In this

regard, the Ninth Circuit in Schell explained:

> Our primary reason for accepting this case for en banc review was
> to correct the standard of review we have been using to examine
> the constitutionality of a state court's handling of a motion to
> substitute appointed counsel based on allegations of an
> irreconcilable conflict.  In Bland, we said that the test is whether a
> state court's denial of such a motion was for an "abuse of
> discretion."  Bland, 20 F.3d at 1475.

>                                        * * *

> [O]ur only concern when reviewing the constitutionality of a state-
> court conviction is whether the petitioner is "in custody in
> violation of the Constitution or laws or treaties of the United
> States."  28 U.S.C. § 2254(a).  See also Coleman v. Thompson,
> 501 U.S. 722, 730, 111 S.Ct. 2546. 115 L.Ed. 640 (1991) ("The
> [habeas] court does not review a judgment but the lawfulness of
> the petitioner's custody simpliciter.") (emphasis in original).  A
> particular abuse of discretion by a state court may amount also to a
> violation of the Constitution, but not every state court abuse of
> discretion has the same effect.

218 F.3d at 1024-25 (footnotes omitted).

           When a defendant indicates dissatisfaction with his counsel, the trial court

ordinarily must conduct an inquiry in order to discover whether the situation is depriving the

defendant of an adequate defense.  Id. at 1025 ("it is well established and clear that the Sixth
Amendment requires on the record an appropriate inquiry into the grounds of such a motion, and
that the matter be resolved on the merits before the case goes forward"); Hudson v. Rushen, 686
F.2d 826, 829 (9th Cir. 1982) (the state trial court's summary denial of a defendant's motion for
new counsel "without further inquiry" violated the Sixth Amendment.").  However, the inquiry
need only be "as comprehensive as the circumstances reasonably would permit."  Id. at 831.
Formal inquiry may not be necessary "where the defendant otherwise stated his reasons for
dissatisfaction on the record."  United States v. Lott, 310 F.3d 1231, 1249 n.15 (10th Cir. 2002)
(quoting United States v. Beers, 189 F.3d 1297, 1302 (10th Cir. 1999)) (quoting United States v.
Willie, 941 F.2d 1384, 1391 (10th Cir. 1991)) (internal quotation marks and citations omitted).
"[I]f the reasons proffered are insubstantial and the defendant receives competent representation
from counsel, a court's failure to inquire sufficiently or to inquire at all constitutes harmless
error."  Id.  See also United States v. Padilla, 819 F.2d 952, 956 n.1 (10th Cir. 1987) ("While the
court did not conduct a formal inquiry into defendant's reasons for terminating appointed and
retained counsel, the omission is harmless where the defendant otherwise stated his reasons for
dissatisfaction.").  A trial court's failure to inquire into a motion for substitute counsel cannot be
deemed prejudicial per se unless, as a result, the defendant is forced to proceed with
representation that does not meet constitutional standards.  Schell, 218 F.3d at 1025-26.

> The ultimate constitutional question the federal courts must answer
> here is not whether the state trial court 'abused its discretion' in not
> deciding Schell's motion, but whether this error actually violated
> Schell's constitutional rights in that the conflict between Schell and
> his attorney had become so great that it resulted in a total lack of
> communication or other significant impediment that resulted in
> turn in an attorney-client relationship that fell short of that required
> by the Sixth Amendment.

Id. at 1026.

          In the instant case, it was not necessary for the trial court to conduct an extensive
inquiry into petitioner's complaints about his trial counsel.  Petitioner fully explained his

1 concerns regarding his counsel in his letter to the trial judge.  The underlying problem appeared

2 to be that petitioner had been unable to contact his trial attorney.  The judge apparently believed

3 that the best way to resolve this problem was to forward petitioner's letter to his trial counsel.

4 Indeed, after receiving the letter counsel undertook to resolve the underlying problem by

5 improving petitioner's access to the telephone.  Petitioner did not pursue any further attempt to

6 obtain substitute counsel and did not raise any further complaints about trial counsel's

7 performance, either during trial or in his subsequent challenges to his conviction.  A conflict

8 inquiry is adequate if it "ease[s] the defendant's dissatisfaction, distrust, and concern" and

9 "provide[s] a 'sufficient basis for reaching an informed decision.'" Daniels v. Woodford, 428

10 F.3d 1181, 1200 (9th Cir. 2005) (quoting Adelzo-Gonzalez, 268 F.3d 772, 777 (9th Cir. 2001))

11 (citations omitted).  It appears that the trial judge's handling of petitioner's letter attached to the

12 form Marsden motion satisfied this test.  On the present record this court is unable to conclude

13 that the trial court's inquiry was inadequate.

14          There is also no evidence in the record that petitioner was deprived of the right to

15 counsel.  Petitioner did not allege in his letter, and it does not appear from the record, that an

16 irreconcilable conflict or a complete breakdown in communication existed between himself and

17 his trial counsel that prevented effective representation.  There is no indication that the

18 communication problems continued or that any conflict prevented petitioner's trial counsel from

19 representing petitioner in a competent manner.  In short, petitioner's allegations, even if true,

20 were insufficient to establish a Sixth Amendment violation.  Petitioner did not allege in his letter

21 that his counsel's performance was deficient or that she was not an "effective advocate." See

22 Wheat v. United States, 486 U.S. 153, 159 (1988) ("the essential aim of the [Sixth] Amendment

23 is to guarantee an effective advocate for each criminal defendant").  Accordingly, it was not

24 objectively unreasonable for the state appellate court to conclude that petitioner's letter attached

25 to a form Marsden motion did not merit a formal hearing.  Cf. Schell, 218 F.3d at 1025

26 (defendant entitled to a hearing on his motion for substitute counsel where his complaints, if true,

1   revealed a "toxic conflict with his lawyer" which might have resulted in the deprivation of any

2   counsel at all); Daniels, 428 F.3d at 1198 (where complete breakdown in communications

3   between the defendant and his counsel resulted in constructive denial of counsel, trial court

4   violated the defendant's Sixth Amendment rights by not questioning him after he brought the

5   matter to the attention of the court).

6          Because petitioner did not suffer a constructive denial of counsel, in order to be

7   entitled to relief he must demonstrate prejudice under Strickland v. Washington, 466 U.S. 668

8   (1984).  Schell, 218 F.3d at 1028 ("if the serious conflict did not rise to the level of a constructive

9   denial of counsel, however, Schell would have to prove he was prejudiced by the conflict").  As

10  the Ninth Circuit has stated:

11              The line between cases such as Brown, Slappy, and this case, on
              the one hand, and those in which the issue is ineffective assistance
12              of counsel, on the other, is sometimes unclear.  Logic alone
              dictates that the greater the hostility between the defendant and his
13              counsel, the longer the duration of the rupture in relations between
              the two, the less communication there is between them, and the
14              more ineffective the counsel's performance appears, the more
              likely it is that the case will be analyzed in terms of whether the
15              defendant was represented by counsel.  If so analyzed, a conclusion
              that no counsel existed invokes the full force of Gideon v.
16              Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).  If
              instead the conclusion is that representation did exist, the issue
17              then becomes whether the defendant received such ineffective
              assistance of counsel as to prejudice his defense.  We have
18              discussed this line between no-counsel cases and ineffective
              counsel cases previously.  (citations omitted.)  We adhere to those
19              discussions.

20              Having concluded, in effect, that the defendant in this case had
              counsel, we have considered the record from the standpoint of
21              whether a substitution should have been allowed on the ground that
              defendant's counsel was ineffective.  We find that no basis for such
22              an order existed. [Counsel] represented the petitioner effectively.

23  Hudson v. Rushen, 686 F.2d at 832.  The same is true here.  A review of the record reflects that

24  petitioner's trial counsel performed competently at trial.  Accordingly, there is no basis to

25  conclude that a substitution of counsel should have been allowed on the ground that petitioner's

26  counsel was ineffective.

27

1    The decision of the California Court of Appeal rejecting petitioner's <u>Marsden</u>

2 claim is not contrary to or an unreasonable application of Sixth Amendment jurisprudence and

3 should not be set aside.  Therefore, petitioner is not entitled to relief on this claim.

4                                              CONCLUSION

5    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

6 a writ of habeas corpus be denied.

7    These findings and recommendations are submitted to the United States District

8 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

9 days after being served with these findings and recommendations, any party may file written

10 objections with the court and serve a copy on all parties.  Such a document should be captioned

11 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

12 shall be served and filed within ten days after service of the objections.  The parties are advised

13 that failure to file objections within the specified time may waive the right to appeal the District

14 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

15 DATED: October 18, 2007.

16

17    _____

18    DALE A. DROZD
      UNITED STATES MAGISTRATE JUDGE

19 DAD:8
   hall2335.hc

20

21

22

23

24

25

26